IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: March 9, 2015**

**NO. 34,435**

**STATE OF NEW MEXICO**,

Plaintiff-Petitioner,

v.

**JASON STRAUCH,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Jacqueline D. Flores, District Judge**

Hector H. Balderas, Attorney General
Ralph E. Trujillo, Assistant Attorney General
Santa Fe, NM

for Petitioner


Theresa Duncan
Albuquerque, NM

for Respondent


New Mexico Children, Youth and Families Department
Jennifer Jo Saavedra
Santa Fe, NM

for Amicus Curiae
New Mexico Children, Youth and Families Department

**OPINION**

**DANIELS, Justice.**

{1}     The child abuse reporting requirement of the Abuse and Neglect Act in the New Mexico Children's Code mandates that

> [e]very person, including a licensed physician; a resident or an intern examining, attending or treating a child; a law enforcement officer; a judge presiding during a proceeding; a registered nurse; a visiting nurse; a schoolteacher; a school official; a social worker acting in an official capacity; or a member of the clergy who has information that is not privileged as a matter of law, who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter

to specified authorities. NMSA 1978, § 32A-4-3(A) (2005). In this case, we consider the scope of this statutory reporting requirement and its relationships to statutory protection of confidential communications and to the privileged-communication provisions of the New Mexico Rules of Evidence.

{2}     We conclude that both privately and publicly employed social workers are mandatory child abuse reporters, in light of the statutory history and the broadly inclusive terms of the Abuse and Neglect Act. Consequently, statements made to a social worker by an alleged child abuser in private counseling sessions are not protected from disclosure in a court proceeding as a result of the specific exception to the physician-patient and psychotherapist-patient evidentiary privilege in Rule 11-504(D)(4) NMRA of the New Mexico Rules of Evidence, which provides, "No

privilege shall apply for confidential communications concerning any material that a [social worker] is required by law to report to a public employee or public agency."

## I.      BACKGROUND

{3}      Defendant Jason Strauch allegedly revealed to his wife that he had been sexually abusing their minor daughter. Defendant moved out of the family home and began attending counseling sessions as a patient of Frederick Stearns, a private-practice social worker licensed by the State of New Mexico. The couple reconciled and Defendant moved back home after several months of counseling. Defendant continued to see Mr. Stearns, and Defendant's wife attended several of these counseling sessions each year over the next few years. When Defendant's daughter revealed to her mother that the sexual abuse had never stopped, his wife separated from Defendant and reported the abuse.

{4}      Defendant was charged with four counts of criminal sexual contact of a minor in the second degree, contrary to NMSA 1978, Section 30-9-13(A)-(B) (2003), which provides enhanced penalties when the victim is under the age of thirteen. After the State filed a notice of intent to call Mr. Stearns as a prosecution witness and attempted to obtain records of the counseling sessions, Defendant filed a motion in the district court for a protective order, arguing that the communications with Mr.

Stearns were protected from disclosure both by statute, particularly NMSA 1978, § 61-31-24(B) (1989) (providing under the Social Work Practice Act that "[n]o licensed social worker may disclose any information he has acquired from a person consulting him in his professional capacity" unless any of four limited exceptions apply), and by evidentiary privilege, particularly Rule 11-504(A)(4), (B)-(D) (establishing under the New Mexico Rules of Evidence that a patient's confidential communications with a licensed social worker "made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition" are privileged from disclosure in a court proceeding unless any of four limited exceptions apply), *see* Rule 11-1101(C) NMRA ("The rules on privilege apply to all stages of a case or proceeding.").[1]

{5}    The State argued that the statutes and evidentiary rules mandated disclosure, pointing to the broadly inclusive term "[e]very person" in the Abuse and Neglect Act reporting requirement, § 32A-4-3(A); to the Social Work Practice Act confidentiality exception, § 61-31-24(C) (requiring disclosure of "information in court hearings concerning matters of adoption, child abuse, child neglect or other matters pertaining

---

[1]The New Mexico Rules of Evidence applicable in 2011 when this case was filed in district court have since been amended "effective for all cases pending or filed [as of various effective 2013 dates]." *See, e.g.*, Rule 11-504 (indicating the effective date provision of the Rules of Evidence). Because those amendments do not affect the substance of the relevant rules or the outcome of this pending case, this opinion does not distinguish between versions of the rules and quotes the current rules.

to the welfare of children as stipulated in the Children's Code"); and to the New Mexico Rules of Evidence evidentiary privilege exception, Rule 11-504(D)(4) (applying to "confidential communications concerning any material that a [social worker] or patient is required by law to report to a public employee or public agency").

{6}    On the issues now before this Court, the district court ruled that Mr. Stearns was not a mandatory reporter under Section 32A-4-3(A) of the Abuse and Neglect Act because his counseling sessions were conducted in his capacity as a private therapist rather than, in the words of the statute, in an "official capacity"; that Defendant's communications with Mr. Stearns were privileged under Rule 11-504; and that the Rule 11-504(D)(4) privilege exception did not apply to the communications between Defendant and Mr. Stearns because Mr. Stearns was not required by law to report what he learned in private counseling sessions.

{7}    On interlocutory appeal by the State, a majority of the Court of Appeals panel affirmed the district court's protective order. *State v. Strauch*, 2014-NMCA-020, ¶¶ 1, 32, 317 P.3d 878. The two-judge majority held that the Abuse and Neglect Act did not make Mr. Stearns a mandatory reporter because the statute does not actually require "every person" to report child abuse but only those categories of persons the

statute specifically identifies after the words, "every person, including," *id.* ¶ 10, as well as "other professionals or government officials who are likely to come into contact with abused [or] neglected children during the course of their professional work," *id.* ¶ 19.

{8}     The majority held as well that Mr. Stearns was statutorily relieved of reporting child abuse because he had not been, in the words of the statute, "a social worker acting in an official capacity." *Id.* ¶ 20. The majority construed that phrase to mean that the statute imposes a reporting requirement only when the social worker counsels patients as a government employee or contractor and not in any other professional capacity. *Id.*

{9}     The majority opinion also held that the communications between Defendant and Mr. Stearns were shielded from disclosure in the district court because Section 61-31-24 of the Social Work Practice Act created an evidentiary privilege with exceptions for testimony about child abuse that applied neither in a criminal proceeding, *id.* ¶ 30, nor in any case in which a social worker had not previously reported the abuse, *id.* ¶ 31, and because the Rule 11-504 privilege exception did not apply where a social worker was not acting as a government employee or contractor and therefore was not a mandatory reporter under Section 32A-4-3(A) of the Abuse

and Neglect Act, *id.* ¶ 20.

{10} The dissent would have reversed the district court's protective order, concluding that the language requiring "'every person'" to report information of child abuse "manifests our Legislature's express intent to create an affirmative duty on all persons to report child abuse." *Id.* ¶ 39 (Hanisee, J., dissenting).

{11} We granted the State's petition for writ of certiorari to address the important precedential issues involved. *See State v. Strauch*, 2014-NMCERT-001.

## II. DISCUSSION

{12} There are two related lines of analysis that determine the result in this case, one of them construing the scope of the mandatory out-of-court child abuse reporting provisions of a criminal statute and the other determining the applicability of in-court evidentiary privileges. Because this controversy arose through an effort to mandate in-court disclosure of arguably privileged communications rather than through a criminal prosecution to punish a failure to report, the privilege rules ultimately are dispositive. But in order to construe and apply privilege rules that depend in part on statutory reporting requirements, it is necessary first to understand the scope of those requirements.

### A. Standard of Review

{13}    This case requires us to construe both legislative enactments and court rules. We review issues of statutory interpretation de novo. *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. Our "primary goal when interpreting statutes is to further legislative intent." *Jordan v. Allstate Ins. Co.*, 2010-NMSC-051, ¶ 15, 149 N.M. 162, 245 P.3d 1214. Although the first guide to statutory interpretation is the actual wording of the statute, we have recognized that where the meaning of the facial language of a statute is in doubt, the plain language approach may not lead to a correct interpretation of true legislative intent. *See Benavides v. Eastern New Mexico Medical Center*, 2014-NMSC-037, ¶ 24, 338 P.3d 1265. In interpreting statutory language as well as in much of the other work courts are called on to perform, it is necessary to think thoughts and not words. *See State v. Office of Pub, Defender ex rel. Muqqddin*, 2012-NMSC-029, ¶ 54, 285 P.3d 622. We have repeatedly cautioned that despite the "'beguiling simplicity'" of parsing the words on the face of a statute, we must take care to avoid adoption of a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction. *State ex rel. Children, Youth & Families Dep't v. Maurice H. (In re Grace H.)*, 2014-NMSC-034, ¶ 34, 335 P.3d 746 (citation omitted); *State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868.

{14} We therefore must "examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *Maes v. Audubon Indem. Ins. Grp.*, 2007-NMSC-046, ¶ 11, 142 N.M. 235, 164 P.3d 934; *see also State Bd. of Educ. v. Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1*, 1981-NMSC-031, ¶ 14, 95 N.M. 588, 624 P.2d 530 ("In ascertaining the legislative intent, we look not only to the language used in [a] statute, but also to the object sought to be accomplished and the wrong to be remedied.").

**B.      Reporting Requirements of the Abuse and Neglect Act**

{15} Despite the fact that the statutory analysis in this case focuses primarily on the single sentence in Section 32A-4-3(A) describing the reporting requirements, the apparent simplicity of that sentence has proved to be deceptive. We appreciate the difficulties the parties and the courts below have had in interpreting the current facial language of the Abuse and Neglect Act because we also have not found satisfactory answers by just looking at the words in the current version of a statute that has been repeatedly amended over the course of the half century since the first version was enacted in 1965. *See* 1965 N.M. Laws, ch. 157. (For the reader's convenience, the appendix to this opinion is a chronology of all versions of the statutory reporting

8

language from 1965 to the present.) Simply parsing words in the current version of the statute and attempting to discern legislative intent from isolated grammatical analyses raises more difficult questions than it provides definitive answers.

{16} For example, if the Legislature had meant to impose a reporting requirement on only the professionals specifically mentioned in the statute, why did it include the words, "[e]very person, including" immediately before identifying those professions? Conversely, if the Legislature had meant to impose a reporting requirement on every person, why did it then specifically mention some occupations and not others? Why did the Legislature amend the statute in 2003 to omit the language "but not limited to" between the words "[e]very person, including" and the listing of identified professionals that followed? *Compare* 2005 N.M. Laws, ch. 189, § 38(A), *with* 2003 N.M. Laws, ch. 189, § 1(A). Why would the Legislature have imposed a mandatory reporting requirement on a social worker providing counseling services while employed by a public school or other government agency and not on a social worker providing the same kind of counseling while employed by a private school or business or while self-employed? If the Legislature really intended "official capacity" to make such a distinction, why would it not apply the same distinction to the physicians and teachers and other occupations mentioned in the statute? More

9

globally, what is the relationship between the reporting requirements of the statute and the evidentiary privileges in the New Mexico Rules of Evidence? And why would the judiciary's evidentiary privilege rules protect the confidentiality of counseling sessions with a privately paid social worker and not the same kind of counseling with a government-salaried social worker? In this opinion, we seek to find a principled resolution that furthers the legislative purpose while either answering those questions or putting them to rest as irrelevant.

{17} As we have found with other unclear statutory provisions in the past, "the statutory history provides us with guidance as to the legislative intent," allowing us to "'promote the legislature's accomplishment of its purpose.'" *Ortiz v. Overland Express*, 2010-NMSC-021, ¶¶ 19, 21, 148 N.M. 405, 237 P.3d 707 (citation omitted) (interpreting a statute to achieve its apparent purpose where amendments had inadvertently led to an unintended textual interpretation). In order to fully appreciate where we are, we need to understand how we got here.

**1.      Statutory Origins**

{18} New Mexico did not enact its child abuse reporting statute in a vacuum. Our statute was part of a national movement that was spurred in 1962 by publication of a seminal article, *The Battered-Child Syndrome*, in the Journal of the American

10

Medical Association. *See* Leonard G. Brown, III & Kevin Gallagher, *Mandatory Reporting of Abuse: A Historical Perspective on the Evolution of States' Current Mandatory Reporting Laws with a Review of the Laws in the Commonwealth of Pennsylvania*, 59 Vill. L. Rev. Tolle Lege 37, 37 & n.4 (2013). Prior to the article's publication, no state had enacted a child abuse reporting law, but within just the next four years, all fifty states had done so. *Id.* at 37.

{19}    Following publication of *The Battered-Child Syndrome*, which "worked to galvanize the American public to take action," Brown & Gallagher, *supra*, at 39, a number of medical and legal professionals published articles about the problem of child abuse and the need for protective statutes, particularly including reporting laws. *See, e.g.*, Allan H. McCoid, *The Battered Child and Other Assaults Upon the Family: Part One*, 50 Minn. L. Rev. 1, 3-19 (1965). The Children's Bureau of the United States Department of Health, Education, and Welfare[2], the Council of State Governments, the American Humane Association, and the American Medical Association all drafted model statutes to "offer various alternatives to the state legislators [considering enactment of reporting legislation] on the issue of who should

[2]The United States Department of Health, Education, and Welfare became the United States Department of Health and Human Services in 1979. As of 1979, the Children's Bureau is an office within a division of the department. *See, e.g.*, organizational information available at http://www.acf.hhs.gov/about/offices.

be required to report." Monrad G. Paulsen, *Child Abuse Reporting Laws: The Shape of the Legislation*, 67 Colum. L. Rev. 1, 2 & n.4, 3 (1967). Throughout the United States, "child abuse reporting laws were passed quickly, perhaps even hastily." Brown & Gallagher, *supra*, at 39.

{20} The 1963 Children's Bureau proposal, initially followed by twenty-two states, would have imposed a reporting duty only on physicians, on the theory that physicians would be in the best position to learn of child abuse. Paulsen, *supra*, at 2 n.4, 3-4, 6; *see* John B. Reinhart & Elizabeth Elmer, *The Abused Child[:] Mandatory Reporting Legislation*, 188 J. Am. Med. Ass'n, Apr. 27, 1964, at 358 (discussing advantages and disadvantages of the 1963 Children's Bureau proposal for the model legislation). An advisory committee of the American Humane Association proposed in 1963 to broaden the class of reporters to include all medical practitioners and hospital personnel. Paulsen, *supra*, at 2 n.6, 4. In 1965, the Council of State Governments added registered nurses to its list of required reporters. *Id.* at 2 n.5, 5.

{21} The "American Medical Association (AMA) objected to physicians' being singled out for a special reporting duty" and proposed adding schoolteachers and social workers to those under a duty to report, extending the reporting requirement in its 1965 proposed legislation to "'any doctor of medicine, resident or intern[,] . . .

any registered nurse, any visiting nurse, any school teacher or any social worker acting in his or her official capacity.'" Paulsen, *supra*, at 3 n.7, 5 (omission in original) (quoting the 1965 AMA proposed legislation); *see* Office of the General Counsel, AMA, Editorial, *Battered Child Legislation*, 188 J. Am. Med. Ass'n, Apr. 27, 1964, at 386 (recommending that mandatory reporting of child abuse extend beyond physicians to other professions, including social workers).

{22} In 1965, the New Mexico Legislature enacted the first predecessor to our current law, a permissive statute providing that "[a]ny licensed practitioner of the healing arts, resident, or intern, examining, attending, or treating a child under the age of 16 years, any registered nurse, any visiting nurse, any school teacher or social worker acting in his or her official capacity, or any ordained minister of an established church" was permitted, but not required, to report suspected child abuse without risk of a lawsuit. 1965 N.M. Laws, ch. 157, § 2. The "official capacity" language has been a feature of the reporting statute in every version from 1965 to the present, and to understand its significance it is important to understand its history.

2. **The "Official Capacity" Language**

{23} In the 1965 New Mexico act, terminology identifying occupations of listed reporters tracked the language of the AMA model statute, including use of the

13

qualifying phrase "acting in his or her official capacity" after the listed occupations; but this original New Mexico act added the language, "any ordained minister of an established church," at the end of the listing instead of inserting it at an earlier point in the listing before the phrase "acting in his or her official capacity." 1965 N.M. Laws, ch. 157, § 2.

{24}     The phrase "acting in his or her official capacity" in the original New Mexico statute was identical in wording and placement to the same phrase contained in the AMA proposed legislation. This phrase followed the entire list of AMA-suggested occupations, and there is nothing in grammar or reason to indicate that it was meant to apply only to the final occupation in the list, social workers. The other states that have adopted the "official capacity" language from the AMA proposal have variously placed the language at the beginning of the listing of occupations, at the end of the listing as in the AMA model, or in a separate paragraph applicable to all categories. *See*, *e.g.*, N.Y. Consol. Laws ch. 55, art. 6, § 413(1)(a) (McKinney 2015) (providing that "[t]he following persons and officials are required to report . . . when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child," followed by a lengthy listing of occupations, including mental health counselors and social workers); 325 Ill. Comp.

14

Stat. Ann. 5/4 (West 2014) (imposing a reporting requirement on an extensive list of occupations and relationships, including social workers, and ending the list with "or any other foster parent, homemaker or child care worker having reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child"); Ohio Rev. Code Ann. § 2151.421(A)(1)(a) (West 2014) ("No person described [in the extensive listing of occupations] in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows, or has reasonable cause to suspect . . . that a child [has been abused] shall fail to immediately report . . . .").

{25}     New Mexico's placement of the "official capacity" qualification before the last-listed occupation, ordained ministers, appears to be nothing more than a historical anomaly resulting from the Legislature's tacking on ordained ministers at the end of the language taken from the AMA model act. *Compare* 1965 N.M. Laws, ch. 157, § 2 (indicating at the end of the listing of permissive reporters ", any registered nurse, any visiting nurse, any school teacher or social worker acting in his or her official capacity, or any ordained minister of an established church . . ."), *with* Paulsen, *supra*, at 5 (indicating at the end of the listing of required reporters "", any registered nurse, any visiting nurse, any school teacher or any social worker acting in his or her official

15

capacity. . . .'" (quoting the 1965 AMA proposed legislation)).

{26}    There is also no reason to find significance in the use of semicolons before and after the language referring to social workers in the current statute. The language in both the AMA model act and the original New Mexico enactment had no punctuation separating the final two occupations listed: "any school teacher or [any] social worker acting in his or her official capacity." 1965 N.M. Laws, ch. 157, § 2. It was not until thirty-eight years later that the semicolons appeared in a 2003 amendment aimed solely at clarifying the clergy's duty to report child abuse. *See* 2003 N.M. Laws, ch. 189, § 1 (amending the law in an act entitled "Relating to the Children's Code: Clarifying a Member of the Clergy's Duty to Report Child Abuse"). In the 2003 amendment process concerned with the clergy's required reporting of information not learned through confidential communications, the commas that had separated all but the last three reporter occupations were replaced with semicolons between all named occupations, changing the relevant language at the time from ", a schoolteacher or a school official or social worker acting in an official capacity" in Chapter 34, Section 2(A) of New Mexico Laws of 1997 to "; a schoolteacher; a school official; a social worker acting in an official capacity; or a member of the clergy who has information that is not privileged as a matter of law" in Chapter 189, Section 1(A) of New Mexico

Laws of 2003.

{27} We have found nothing in our research to indicate that, by using the phrase "acting in ['his or her' or 'an' or 'their'] official capacity" at the end of the list of covered occupations, either the AMA or the jurisdictions that used its suggested language meant to distinguish between health care, education, and social work professionals employed by government and those employed otherwise. In fact, the few cases to construe the language at all use "official capacity" interchangeably with "professional capacity," interpreting the language to distinguish between child abuse knowledge gained through activities in the listed occupations and knowledge gained in other capacities. The rationale underlying the use of the modifiers "official" or "professional" has been explained well by the Ohio Supreme Court:

> Because abused and neglected children lack the ability to ameliorate their own plight, [the Ohio reporting statute] imposes mandatory reporting duties on "those with special relationships with children, such as doctors and teachers." These persons, when acting in their official or professional capacity, hold unique positions in our society. They are not only the most likely and qualified persons to encounter and identify abused and neglected children, but they are often directly responsible for the care, custody, or control of these children in one form or another.

*Yates v. Mansfield Bd. of Educ.*, 2004-Ohio-2491, ¶ 30, 808 N.E.2d 861 (citations omitted). "The duty is to report knowledge or suspicion of abuse or neglect that the designated persons encounter while doing their ordinary work. . . . What the statute

17

requires is actually quite minimal: when teachers, or others who are required to report, encounter suspected abuse or neglect in their official capacity, they must report it." *State v. Clark*, 2013-Ohio-4731, ¶¶ 83, 85, 999 N.E.2d 592 (O'Connor, C.J., dissenting on an issue unrelated to the reporting requirement), *cert. granted*, ___ U.S. ___, 135 S. Ct. 43 (2014). Our research has found no case from any other jurisdiction that discerned a distinction between professionals receiving their compensation from the government and those receiving their compensation from private individuals or organizations.

{28}     The "official capacity" language had more significance in New Mexico's original version of the reporting statute applicable only to the named occupations, a limitation that changed in just a few years with statutory amendments that expanded the list of reporters from certain described occupations to all persons learning of abuse and changed the reporting from discretionary to mandatory.

**3.     The "Every Person" Language**

{29}     Following the initial adoption of child abuse legislation by New Mexico and other states, the American Humane Association in 1966 endorsed legislation proposing to place a reporting duty on all persons rather than only on identified categories, on the theory that alerting authorities to child abuse was a "'universal

18

obligation of all responsible citizens and all community agencies.'" Paulsen, *supra*, at 5 & n.17 (quoting 1966 American Humane Association recommendations for legislation).

{30} Initially, three states, Nebraska, Tennessee, and Utah, adopted universal reporting by either "requiring all adults to report while also enumerating certain professional groups or simply requiring all adults to report." Brown & Gallagher, *supra*, at 40 & n.25. Indiana followed suit in 1971, amending its designated reporter statute to one "that would subsequently be mimicked by fifteen other states." *Id.* at 42. The Indiana statute "enumerated certain categories of professionals that were required to report while also putting the duty on all persons in the state." *Id.*

{31} In 1973, New Mexico became one of those states by amending its reporting statute (1) to broaden the class of reporters by substituting the language "or any other person having reason to believe [a child has been abused]" in Chapter 360, Section 2(A) of New Mexico Laws of 1973 for the language "or any ordained minister of an established church, having reason to believe [a child has been abused]" in Chapter 157, Section 2 of New Mexico Laws of 1965 after the designated occupations listing that ended with "school teacher or social worker acting in his or her official capacity," and (2) to make reporting mandatory ("shall report") instead of simply permissive

("may report").

{32}	Also in 1973, the federal government passed the Child Abuse Prevention and Treatment and Adoption Reform Act, *see* 42 U.S.C. §§ 5101-5107 (2012), which required every state to enact mandatory, rather than permissive, child abuse reporting statutes in order to be eligible for federal funding. Brown & Gallagher, *supra*, at 43 & n.41, 45. The Children's Bureau reported that as of November 2013 all states had mandatory reporting statutes, the majority limiting the duty to identified categories but eighteen states placing all persons under a duty to report. *See* United States Department of Health and Human Services, Children's Bureau, *Mandatory Reporters of Child Abuse and Neglect*, at 1-2 & n.9 (2013), available at https://library.childwelfare.gov/cwig/ws/library/docs/gateway/Record?w=NATIV E%28%27SIMPLE_SRCH+ph+is+%27%27Mandatory+Reporters+of+Child+Ab use+and+Neglect%27%27%27%29&upp=0&order=native%28%27year%2FDesc end%27%29&rpp=25&r=1&m=2& (last visited March 6, 2015).

{33}	Sixteen of the eighteen states that impose reporting duties on everyone, including New Mexico, "specify certain professionals who must report but also require all persons to report suspected abuse or neglect, regardless of profession." *Id.* at 2 & n.9, 15-57 (naming New Mexico and the fifteen other states and citing and

20

summarizing the reporting statutes of these states). This combination of identified occupations and broadly inclusive language has been widely recognized as imposing universal reporting requirements.

> The broadest category of mandated reporters are those indicated by provisions that specify "any person, including but not limited to . . ." followed by a listing of specified professions required to report, or that begin with a listing of professions that must report, then conclude with the phrase, "or any other person . . . ."

United States Department of Health and Human Services, Children's Bureau Issue Paper, *Current Trends in Child Maltreatment Reporting Laws*, at 3 & n.9 (September 2002), available at

https://library.childwelfare.gov/cwig/ws/library/docs/gateway/Record?w=NATIVE%28%27SIMPLE_SRCH+ph+is+%27%27Current+Trends+in+Child+Maltreatment+Reporting+Laws%27%27%27%29&upp=0&order=native%28%27year%2FDescend%27%29&rpp=25&r=1&m=1& (last visited March 6, 2015) (citing New Mexico as one of the eighteen states whose statutes impose a duty on "any person who suspects child abuse or neglect"); *see also* Brown & Gallagher, *supra*, at 42 & n.34 (listing New Mexico among the states that followed Indiana's lead in combining identified occupations with "any person" or "any other person" language to impose duties to report child abuse on all persons and not just those

21

identified); Mary Harter Mitchell, *Must Clergy Tell? Child Abuse Reporting Requirements Versus the Clergy Privilege and Free Exercise of Religion*, 71 Minn. L. Rev. 723, 729 (1987) ("[M]any statutes, in addition to or instead of listing those persons required to report, simply impose the duty to report on 'any person' who suspects child abuse." (footnote omitted)).

{34}   It is helpful to consider the persuasive interpretations of similar statutory schemes by authorities in other jurisdictions. *See Sec. Ins. Co. of Hartford v. Chapman*, 1975-NMSC-052, ¶ 19, 88 N.M. 292, 540 P.2d 222 ("Of course, the decisions of other states, if any, which have statutory provisions comparable to ours, with which we are here concerned, are persuasive but not binding on us."). Florida, Idaho, Kentucky, New Hampshire, and Texas are among the sixteen states with child abuse reporting laws similar to the New Mexico law, identifying specific professionals while simultaneously requiring "any other person" or "any person" or "other person" to report. *See* Fla. Stat. Ann. § 39.201(1)(a), (d) (West 2014) ("Any person who . . . has reasonable cause to suspect[] that a child is abused . . . shall report such knowledge[,] . . . [and r]eporters in the [listed] occupation categories are required to provide their names . . . ."); Idaho Code Ann. § 16-1605(1) (West 2005) ("Any physician, . . . social worker, or other person having reason to believe that a

22

child . . . has been abused . . . shall report . . . ."); Ky. Rev. Stat. Ann. § 620.030(1) (West 2013) ("Any person who . . . has reasonable cause to believe that a child is . . . abused shall immediately . . . report . . . ."); N.H. Rev. Stat. Ann. § 169-C:29 (West 1979) ("Any physician, . . . social worker, . . . or rabbi or any other person having reason to suspect that a child has been abused . . . shall report . . . ."); Tex. Fam. Code Ann. § 261.101(a)-(b) (West 2013) ("A person having cause to believe that a child's . . . health or welfare has been adversely affected by abuse . . . shall immediately make a report . . . and . . . [any listed] professional shall make [the] report not later than the 48th hour after the hour the professional first suspects [the abuse]."). Idaho, Kentucky, and Texas courts and the Florida Attorney General have interpreted the scope of the duty to report under their similarly worded statutes to extend to all persons. *See Quiring v. Quiring*, 944 P.2d 695, 702 (Idaho 1997) (relying on the prior enumeration of the mandatory reporting statute, Idaho Code Ann. § 16-1619(a) (1989), to conclude that a wife was obligated to report her husband's sexual abuses of their child despite an alleged agreement between the two to refrain from reporting); *Norton Hosps., Inc. v. Peyton*, 381 S.W.3d 286, 289, 291-92 (Ky. 2012) (relying on the mandatory reporting statute, Ky. Rev. Stat. Ann. § 620.030, in holding a hospital immune from liability for mistakenly overreporting the blood alcohol content of a

23

mother giving birth); *Rodriguez v. State*, 47 S.W.3d 86, 88-89 (Tex. Ct. App. 2001) (relying on the Texas Family Code Annotated, Section 261.101, in requiring adults to report abuse of a child by the child's mother); Fla. Att'y Gen. Op. 2004-57 (2004) (recognizing that the Florida Statutes Annotated, Section 39.201(1) (2003) "has led to confusion as to the persons actually considered mandated reporters, i.e., all persons or just the list of professions" and concluding that the Florida statute "imposes a responsibility on any person who knows of or has reasonable cause to suspect child abuse . . . to report such abuse").

{35}     Our research has found no published judicial opinion in any other state that has construed its combined specific and general statutes as imposing obligations only on the identified occupations. And we see no reason to construe New Mexico's statute in such a manner, particularly in light of its history. We have been presented with no persuasive argument that, when the Legislature followed the lead of other states in 1973 in adding "or any other person" at the end of the list of previously described reporters, it meant anything other than "any other person." Interpreted otherwise, the amendment would have been meaningless. As has been observed elsewhere, we believe that "[s]pecific mention of various professional groups, but inclusion of 'anyone,' is a feature of [a reporting statute] that tends to focus the requirement of

24

reporting on the specific groups, while retaining the advantages of a broad reporting class." Donald Stuart, *Mandatory Reporting of Child Abuse in Nebraska*, 8 Creighton L. Rev. 791, 793-94 (1975) (footnote omitted) (discussing the Nebraska statute that was one of the first to combine specific occupational listings with a universal requirement to report child abuse).

{36} Subsequent amendments have consistently maintained the broad scope of the 1973 expansion of the New Mexico statute. In the course of making other amendments in 1993, the Legislature placed the inclusive language at the beginning instead of the end of the listed occupations and emphasized that the list that followed was not exclusive. *Compare* 1993 N.M. Laws, ch. 77, § 97(A) ("Every person, including but not limited to a licensed physician [and other listed occupations] . . . shall report [child abuse]."), *with* 1973 N.M. Laws, ch. 360, § 2(A) ("Any licensed physician [and other listed occupations] or any other person . . . shall report [child abuse].").

{37} The 2003 deletion of "but not limited to" following "[e]very person, including" does not change our analysis. See 2003 N.M. Laws, ch. 189, § 1(A). Chapter 189 of New Mexico Laws of 2003 was titled, "Relating to the Children's Code: Clarifying a Member of the Clergy's Duty to Report Child Abuse." Its significant effect was to

25

add at the end of the occupational listing the language "or a member of the clergy who has information that is not privileged as a matter of law," clarifying that clergy were not required to disclose protected communications. *See* 2003 N.M. Laws, ch. 189, § 1(A). In the process of achieving that sole objective in 2003, the 2003 act made some routine clerical cleanups, such as replacing the commas in the occupational listing with semicolons and deleting the "but not limited to" language, in accordance with the New Mexico Legislative Council Service's Legislative Drafting Manual 31 (2000, amended 2008) ("There is no need to write 'includes but is not limited to'; the word 'includes' implies an incomplete listing. Put another way, 'includes' includes the concept of 'not limited to'."). There is absolutely no indication in the legislative history that by complying with its own technical drafting manual, the Legislature intended to make an unannounced policy change from the universal reporting requirement that had existed for thirty years to a sharply limited requirement.

{38} Accordingly, we conclude that the social worker in this case was a mandated reporter under the Abuse and Neglect Act. Because this case is not an enforcement proceeding under the act but is instead a proceeding to compel discovery and testimony in our courts, we must now address the matter of evidentiary privileges

26

applicable in judicial proceedings.

**C.      Application of Evidentiary Privileges**

**1.       Evidentiary Privileges and Separation of Powers**

{39} When analyzing in-court evidentiary privileges, as opposed to out-of-court confidentiality and reporting requirements, it is important to start with the recognition that this Court's "constitutional power . . . of superintending control over all inferior courts carries with it the inherent power to regulate all pleading, practice and procedure affecting the judicial branch of government." *State ex rel. Anaya v. McBride*, 1975-NMSC-032, ¶ 10, 88 N.M. 244, 539 P.2d 1006 (citing Article III, Section 1 and Article VI, Section 3 of the New Mexico Constitution); *see also Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶ 5, 138 N.M. 398, 120 P.3d 820 ("[W]e have exercised our superintending control under Article VI, Section 3, to revoke or amend a statutory provision when the statutory provision conflicts with an existing court rule."). With respect to privileges in particular, if a statutory privilege is not consistent with a rule of this Court, "the statutory privilege is not given effect and the constitutional or court rule privilege prevails." *Blackmer*, 2005-NMSC-032, ¶ 11. Accordingly, the provisions of Section 61-31-24(A) that arguably create social worker evidentiary privileges cannot prevent court-ordered disclosure

27

of communications that would be mandated by the discovery and evidence rules of this Court.

{40} We turn now to an analysis of those rules.

**2. Social Worker Privilege in the New Mexico Rules of Evidence**

Rule 11-501 NMRA of the New Mexico Rules of Evidence provides that,

> [u]nless required by the constitution, these rules, or other rules adopted by the supreme court, no person has a privilege to . . . refuse to be a witness; . . . refuse to disclose any matter; . . . refuse to produce any object or writing; or . . . prevent another from being a witness, disclosing any matter, or producing any object or writing.

{41} We have been presented with no argument that a constitutional provision prohibits court-ordered disclosure of the counseling communications in this case, nor is there an argument that any nonevidentiary rule of this Court protects communications with a social worker from disclosure, such as might arise with officers of the court subject to the regulatory authority of the Supreme Court. *Cf.* Rule 16-106 NMRA (providing that no attorney may disclose protected information concerning a client, whether in or out of court, except in accordance with the rule).

{42} The only remaining issue is whether the communications are protected from court-ordered disclosure by Rule 11-504 of the New Mexico Rules of Evidence, providing a specific privilege for a person's professional communications with

physicians and mental health counselors, specifically including licensed social workers.

{43} The basic privilege applicable to communications with physical and mental health professionals provides that "[a] patient has a privilege to refuse to disclose, or to prevent any other person from disclosing, a confidential communication made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition . . . ." Rule 11-504(B). The privilege generally seeks to ensure that a patient can communicate fully with a mental health professional without the risk that the information will be used against the patient in a court proceeding. *See Blackmer*, 2005-NMSC-032, ¶ 15 (recognizing as well that such uninhibited communication "serves the public interest by facilitating the administration of appropriate treatment").

{44} Privileges often have limits, particularly where there are conflicting interests that may outweigh the interests of confidentiality. *See, e.g.*, Rule 11-503(D) NMRA (defining exceptions to the lawyer-client privilege, including where the client is obtaining counsel in "[f]urtherance of crime or fraud"); Rule 11-505(D) NMRA (defining exceptions to the spousal privilege, including when one spouse is charged with a crime against the child of either spouse). A privilege exception that was

specifically added to the rule for health professionals in 1990 provided,

> No privilege shall apply for confidential communications concerning any material that a physician, psychotherapist, state or nationally licensed mental-health therapist, or patient is required by law to report to a public employee or public agency.

Rule 11-504(D)(4).

{45} Before the 1990 amendment of Rule 11-504, there was a potential conflict between our privilege rules and a provision, now encoded in NMSA 1978, Section 32A-4-5 (2009) of the Abuse and Neglect Act, that purported to legislate an exception to any applicable "physician-patient privilege or similar privilege or rule against disclosure" relating to required child abuse reporting matters "in any proceeding." *See* § 32A-4-5(A); 1965 N.M. Laws, ch. 157, § 5 (original enactment of this provision). This statutory exception to health care worker privileges was a feature of the Children's Bureau 1963 model act for reporting child abuse and has been adopted in most, if not all, jurisdictions. *See* Brown & Gallagher, *supra*, at 39, 67-68 & n.154; Paulsen, *supra*, at 36-37. Providing a privilege exception in the model statutes was understandable because in most states the legislative branch regulates evidentiary privileges, unlike in New Mexico and other states with similar constitutional structures where regulation of court practice and procedure is under judicial branch authority. *See, e.g.*, *State v. Sypult*, 800 S.W.2d 402, 406 (Ark. 1990)

30

(Newbern, J., concurring) (noting that "the Supreme Court of New Mexico relied on almost identical language in the New Mexico constitution as authority for" its adoption of rules of evidence and that the "step has been taken not only in New Mexico . . . but also in Florida, in Montana, and in Wisconsin" (internal quotation marks and citationomitted)). The Arkansas Supreme Court held that a court's "deference to legislation involving rules of evidence and procedure will be given only to the extent the legislation is compatible with [that court's] established rules." *Sypult*, 800 S.W.2d at 405.

{46}     By adopting the 1990 privilege exception for our own court rules furthering the disclosure purposes underlying New Mexico's reporting statute, we ensured that our "physician-patient privilege or similar privilege," specifically Rule 11-504, the privilege rule relating to physical and mental health professionals, did not prevent mandated in-court disclosure of what otherwise would have been protected communications.

{47}     Because Mr. Stearns was a mandated reporter under the Abuse and Neglect Act, and because the social worker communications provisions in the New Mexico Rules of Evidence deny protection from in-court disclosure of matters that are required by law to be reported out of court, the communications between Defendant

31

and Mr. Stearns are not shielded from compelled disclosure by evidentiary privilege.

## III.   CONCLUSION

{48}   We reverse the decisions of the courts below and remand to the district court for proceedings in accordance with this opinion.

{49}   **IT IS SO ORDERED.**


_____
                                **CHARLES W. DANIELS, Justice**

**WE CONCUR:**


_____
**BARBARA J. VIGIL, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**

# APPENDIX
## STATUTORY LANGUAGE DESCRIBING CHILD ABUSE REPORTERS, 1965–2015

**1965 N.M. Laws, ch. 157, § 2**

Any licensed practitioner of the healing arts, resident, or intern, examining, attending, or treating a child under the age of 16 years, any registered nurse, any visiting nurse, any school teacher or social worker acting in his or her official capacity, or any ordained minister of an established church, having reason to believe that a child has had serious injury or injuries inflicted upon him or her as a result of abuse, neglect or starvation, may report the matter promptly to the appropriate district attorney.

**1973 N.M. Laws, ch. 360, § 2(A)**

Any licensed physician, resident or intern examining, attending, or treating a child, any law enforcement officer, registered nurse, visiting nurse, school teacher or social worker acting in his or her official capacity, or any other person having reason to believe that serious injury or injuries have been inflicted upon a child as a result of abuse, neglect or starvation, shall report the matter immediately to:

    (1)    the county social services office of the health and social services department in the county where the child resides; or

    (2)    the probation services office of the judicial district in which the child resides.

**1993 N.M. Laws, ch. 77, § 97(A)**

Every person, including but not limited to a licensed physician, a resident or an intern examining, attending or treating a child, a law enforcement officer, a judge presiding during any proceeding, a registered nurse, a visiting nurse, a schoolteacher, or a school official or social worker acting in an official capacity who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to:

    (1)    a local law enforcement agency;

    (2)    the department office in the county where the child resides; or

    (3)    tribal law enforcement or social services agencies for any Indian child residing in Indian country.

**1997 N.M. Laws, ch. 34, § 2(A)**

Every person, including but not limited to a licensed physician, a resident or an intern examining, attending or treating a child, a law enforcement officer, a judge presiding during any proceeding, a registered nurse, a visiting nurse, a schoolteacher or a school official or social worker acting in an official capacity who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to:

 (1) a local law enforcement agency;

 (2) the department office in the county where the child resides; or

 (3) tribal law enforcement or social services agencies for any Indian child residing in Indian country.

**2003 N.M. Laws, ch. 189, § 1(A)**

Every person, including a licensed physician; a resident or an intern examining, attending or treating a child; a law enforcement officer; a judge presiding during a proceeding; a registered nurse; a visiting nurse; a schoolteacher; a school official; a social worker acting in an official capacity; or a member of the clergy who has information that is not privileged as a matter of law, who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to:

 (1) a local law enforcement agency;

 (2) the department office in the county where the child resides; or

 (3) a tribal law enforcement or social services agency for any Indian child residing in Indian country.

**2005 N.M. Laws, ch. 189, § 38(A)**

Every person, including a licensed physician; a resident or an intern examining, attending or treating a child; a law enforcement officer; a judge presiding during a proceeding; a registered nurse; a visiting nurse; a schoolteacher; a school official; a social worker acting in an official capacity; or a member of the clergy who has information that is not privileged as a matter of law, who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to:

 (1) a local law enforcement agency;

 (2) the department; or

 (3) a tribal law enforcement or social services agency for any Indian child

residing in Indian country.